# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| JEAN-NICOLAS TREMBLAY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, VIVEK GARIPALLI, ANDREW TOY, CHAMATH PALIHAPITIYA, STEVEN TRIEU, IAN OSBORNE, JACQUELINE D. RESES, and JAMES RYANS,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jean-Nicolas Tremblay ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Clover Health Investments, Corp. f/k/a Social Capital Hedosophia Holdings Corp. III ("SCH", "Clover", or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Clover securities between October 6, 2020 and February 3, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      SCH was a publicly-traded blank check company, also known as a special purpose acquisition company ("SPAC"), formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses.

3.      On October 6, 2020, SCH and a private health insurance company, Clover Health Investments, Corp. ("Legacy Clover"), issued a press release announcing their plan to bring Legacy Clover public via a merger between SCH and Legacy Clover (the "Business Combination"). That press release described Legacy Clover as "a next-generation Medicare Advantage insurance company offering best-in-class plans that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses[.]"

4.      Legacy Clover's (and following the Business Combination, Clover's) flagship platform, the Clover Assistant, purportedly aggregates millions of relevant health data points—including claims, medical charts, and diagnostics—and uses machine learning to synthesize that data with member-specific information. This purportedly provides physicians with actionable and personalized insights at the point of care, offering suggestions for medications and dosages

2

as well as the need for, among other things, tests or referrals, to ultimately improve health outcomes.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) SCH had performed inadequate due diligence into Legacy Clover prior to the Business Combination, or else ignored and/or failed to disclose multiple red flags concerning Legacy Clover's business and operations; (ii) since before the Business Combination, Legacy Clover and/or Clover have been under active investigation by the U.S. Department of Justice ("DOJ") for multiple issues ranging from kickbacks to marketing practices to undisclosed third-party deals; (iii) Legacy Clover's and/or Clover's sales were, and/or are, driven in large part by an undisclosed related party deal, misleading marketing targeting the elderly, and other illicit practices; (iv) Defendants overstated the capabilities of the Company's technology; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.     On February 4, 2021, Hindenburg Research ("Hindenburg") issued a report on Clover entitled "Clover Health: How the 'King of SPACs' Lured Retail Investors Into a Broken Business Facing an Active, Undisclosed DOJ Investigation."  Citing "more than a dozen interviews with former employees, competitors, and industry experts, dozens of calls to doctor's offices, and a review of thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials," Hindenburg claimed that "Clover Health and its Wall Street celebrity promoter, Chamath Palihapitiya, misled investors about critical aspects of Clover's business in the run-up to the company's SPAC go-public transaction last month."

7.     Specifically, the Hindenburg report concluded, among other things, that the Company and Clover Assistant "are under active investigation by the [DOJ]" for "at least 12 issues ranging from kickbacks to marketing practices to undisclosed third-party deals"; that "Clover's sales are driven by a major undisclosed related party deal and misleading marketing targeting the elderly"; that "Clover's software is primarily a tool to help the company increase coding reimbursement"; that doctors at key Clover providers view Clover Assistant as "embarrassingly rudimentary", "a waste of . . . time", and just another administrative hassle to deal with; and that Clover pays physicians "$200 per visit to use the software, twice the normal reimbursement rate for a Medicare visit."

8.     On this news, Clover's stock price fell $1.72 per share, or 12.33%, to close at $12.23 per share on February 4, 2021, representing a loss of approximately $700 million in market capitalization.  Moreover, shares traded as low as $11.86 per share intraday on February 4, 2021.  Additionally, Clover warrants fell $0.18 per warrant, or 5.04%, to close at $3.39 per warrant on February 4, 2021.

9.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Clover is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Clover securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Clover is a Delaware corporation with principal executive offices located at 725 Cool Springs Boulevard, Suite 320, Franklin, Tennessee 37067.  The Company's securities trade in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbols "CLOV" and "CLOVW".  Prior to the Business Combination, the Company (*i.e.*, SCH) was a Cayman Islands corporation with principal executive offices located at 317 University Avenue, Suite 200, Palo Alto, California 94301, and its securities traded on the New York Stock Exchange ("NYSE") under the ticker symbols "IPOC.U", "IPOC", and "IPOC WS".

16.     Defendant Vivek Garipalli ("Garipalli") has served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("Chairman") at all relevant times following the Business Combination.  Garipalli also served as Legacy Clover's Co-Founder and CEO at all relevant times prior to the Business Combination.

5

17. Defendant Andrew Toy ("Toy") has served as the Company's President, Chief Technology Officer ("CTO"), and a Director of the Company at all relevant times following the Business Combination. Toy also served as Legacy Clover's Co-Founder, President, CTO, and a Director of Legacy Clover at all relevant times prior to the Business Combination.

18. Defendant Chamath Palihapitiya ("Palihapitiya") served as the Company's CEO and Chairman at all relevant times prior to the Business Combination.

19. Defendant Steven Trieu ("Trieu") served as the Company's Chief Financial Officer at all relevant times prior to the Business Combination.

20. Defendant Ian Osborne ("Osborne") served as the Company's President and a Director of the Company at all relevant times prior to the Business Combination.

21. Defendant Jacqueline D. Reses ("Reses") served as a Director of the Company at all relevant times prior to the Business Combination.

22. Defendant Dr. James Ryans ("Ryans") served as a Director of the Company at all relevant times prior to the Business Combination.

23. Defendants Garipalli, Toy, Palihapitiya, Trieu, Osborne, Reses, and Ryans are sometimes referred to herein as the "Individual Defendants."

24. The Individual Defendants possessed the power and authority to control the contents of Clover' SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Clover' SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Clover, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and

6

were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

25. Clover and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26. SCH was a publicly-traded blank check company, also known as an SPAC, formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses.

27. On October 6, 2020, SCH and Legacy Clover, which was a private medical insurance company, announced their plan to conduct the Business Combination to create Clover, which would become a public medical insurance company.

28. Legacy Clover's (and following the Business Combination, Clover's) flagship platform, the Clover Assistant, purportedly aggregates millions of relevant health data points—including claims, medical charts, and diagnostics—and uses machine learning to synthesize that data with member-specific information. This purportedly provides physicians with actionable and personalized insights at the point of care, offering suggestions for medications and dosages as well as the need for, among other things, tests or referrals, to ultimately improve health outcomes.

### Materially False and Misleading Statements Issued During the Class Period

29. The Class Period begins on October 6, 2020, when SCH and Legacy Clover announced the Business Combination (the "October 2020 Press Release"). That press release

7

touted, *inter alia*, that "[Legacy] Clover is a next-generation Medicare Advantage insurance company offering best-in-class plans that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses"; that, with "[a] unique model in health insurance, [Legacy] Clover partners with primary care physicians using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care"; that the Business Combination "is expected to fuel Clover's trajectory as one of the nation's fastest growing Medicare Advantage plans"; that the Business Combination "values Clover at an enterprise value of $3.7 billion and is expected to provide up to $1.2 billion in cash proceeds, including a fully committed PIPE [private investment in public equity] of $400 million and up to $828 million of cash held in the trust account of [SCH]"; and that Clover was expected to receive up to $728 million of transaction proceeds and that up to $500 million of cash proceeds were expected to be allocated to existing Clover shareholders.

30. The October 2020 Press Release further stated, in relevant part:

Technology is at the core of [Legacy] Clover's business – the Company is a true innovator in the Medicare Advantage space, deploying its own internally-developed software to assist physicians with clinical decision-making at the point of care.

[Legacy] Clover's flagship platform, the Clover Assistant, aggregates millions of relevant health data points – including claims, medical charts and diagnostics, among others – and uses machine learning to synthesize that data with member-specific information. This provides physicians with actionable and personalized insights at the point of care, offering suggestions for medications and dosages as well as the need for tests or referrals, among others, to ultimately improve health outcomes. The Clover Assistant enables a virtuous growth cycle, whereby improved health outcomes lead to superior economics that the Company shares with members through lower costs and rich benefits. In turn, the Company believes its best-in-class plans will continue to deliver market-leading growth, allowing the Clover Assistant to capture and synthesize more data and ultimately drive better care.

\* \* \*

8

Today, [Legacy] Clover is the fastest growing Medicare Advantage insurer in the United States – among insurers with more than 50,000 members – and serves more than 57,000 members in 34 counties across 7 states. Spurred by favorable demographic tailwinds and its differentiated, technology-driven approach, [Legacy] Clover has captured an average of 50 percent of the net increase in membership across its established markets over the last three years. Further, the Company's software-centric approach enables efficient expansion into new markets, including to historically underserved and rural communities. The Company plans to expand into an additional 74 counties and eighth state next year and recently announced a new partnership with Walmart to make joint Clover-Walmart plans available to half a million Medicare-eligibles in eight Georgia counties.

[Legacy] Clover's management team, led by CEO and Co-Founder Vivek Garipalli and President and Co-Founder Andrew Toy, will continue to lead Clover following the transaction. Chamath Palihapitiya, Founder and CEO of SCH, will act as a senior advisor to the Company's management.

31.     The October 2020 Press Release also quoted Defendant Toy, who stated:

I believe that more and more doctors are embracing the Clover Assistant because it allows them to focus on what they want to do, which is to look after patients. Importantly, the platform is empowered by a closed feedback loop, linking clinical data and physician action, which improves continuously as membership grows, allowing us to constantly evolve new ways of helping physicians and their patients.

32.     Also on October 6, 2020, SCH and Legacy Clover filed the Agreement and Plan of Merger as an Exhibit to a Form 425 Prospectus with the SEC. Sec. 4.30(a) ("Healthcare Compliance") of this Agreement and Plan of Merger provided, in relevant part, that "[e]ach of [Legacy Clover] and its Subsidiaries (i) in all material respects meets and complies with, and since January 1, 2018, has met and complied with, all applicable Laws, including all Health Care Laws, and other requirements for participation in, and receipt of payment from, the Medicare Advantage Program." Elsewhere in the Agreement and Plan of Merger, "Health Care Laws" is defined to include, *inter alia*, the Federal False Claims Act, the Federal Anti-Kickback Law, and many other related laws.

9

33. Sec. 4.30(d) of the Agreement and Plan of Merger provided, in relevant part, that "[s]ince January 1, 2018 . . . each of [Legacy Clover] and its Subsidiaries has implemented and maintained a compliance program, including policies, procedures and training, intended to ensure compliance with all applicable Health Care Laws."

34. That same day, Defendant Palihapitiya was interviewed on CNBC, wherein he touted Legacy Clover and the Business Combination, representing, in relevant part, that "[w]hat we have is a business that's actually delivering the promise of technology-improving, better outcomes and lower cost health care," and that "[t]his is one of the most straightforward investments I've ever made," while also indicating that by 2023 the Company would have overall profitability. Defendant Palihapitiya further stated that Legacy Clover was not engaged in the practice of "upcoding," or inputting inaccurate medical information to increase reimbursement from government payors such as Medicare. Specifically, with respect to Legacy Clover, Defendant Palihapitiya stated, in relevant part: "They create transparency. They don't play games. They don't motivate doctors to upcode or do all kinds of things in order to get paid." Additionally, Defendant Palihapitiya stated that SCH was "really excited after months of diligence and work to announce [the] merger between IPOC and [Legacy Clover] to take [Legacy Clover] public."

35. On October 20, 2020, SCH filed a registration statement on Form S-4 with the SEC in connection with the Business Combination (the "Registration Statement"), which was signed by Defendants Palihapitiya, Trieu, Osborne, Reses, and Ryans. In the Registration Statement, SCH and Legacy Clover represented that they had discussed "typical due diligence," and that "[f]rom August 25, 2020 to August 28, 2020," SCH, Legacy Clover, and their legal representatives "held a meeting via video teleconference to discuss certain preliminary

10

healthcare regulatory and compliance due diligence matters, given the regulated nature of [Legacy] Clover's business." This document further provided that on August 27, 2020, SCH's legal counsel was "provided with access to a virtual data room of [Legacy] Clover and began conducting a preliminary legal due diligence review of [Legacy] Clover." The Registration Statement further provided that representatives of SCH and Legacy Clover met several other times to discuss, *inter alia*, due diligence review and matters associated therewith.

36. The Registration Statement further provided that, in reaching its recommendation to pursue the Business Combination with Legacy Clover, the Company's Board of Directors:

> [C]onsidered the scope of the due diligence conducted by SCH's senior management and outside advisors and evaluated the results thereof and information available to it related to [Legacy] Clover, including: (a) extensive virtual meetings and calls with [Legacy] Clover's management team regarding its operations, projections and the proposed transaction; and (b) review of materials related to [Legacy] Clover and its business, made available by [Legacy] Clover, including financial statements, material contracts, key metrics and performance indicators, benefit plans, employee compensation and labor matters, intellectual property matters, real property matters, information technology, privacy and personal data, litigation information, healthcare matters and other regulatory and compliance matters and other legal and business diligence.

37. Additionally, the Registration Statement represented that "[w]e work diligently to ensure compliance with all applicable laws and regulations." The Company repeated this same sentence in several other public SEC filings during the Class Period, including in at least a January 13, 2021 Form S-1 Registration Statement and a January 29, 2021 Form 424B3 Prospectus.

38. On November 19, 2020, SCH filed a presentation with the SEC entitled "Clover Health: A Deeper Dive." This presentation lauded Legacy Clover's "Virtuous Growth Cycle." The presentation further asserted that "Physicians Value the Clover Assistant," and that "[i]n ~2 years since product launch, we've built a broad base of engaged physicians. Given our software-

11

driven approach, we believe we can scale these results rapidly within existing and new markets." This presentation further stated that physicians were "[i]ncentivized to use [Legacy Clover's] highly delightful tech platform . . . that suggests personalized care recommendations at the point of care" and that the platform was "[d]esigned to work with any PCP and remove financial concerns from clinical decision-making."

39. On January 7, 2021, the Company announced the completion of the Business Combination. Defendant Garipalli stated in this release:

> As a public company, we will continue to pioneer a fundamentally different approach in the Medicare Advantage and Medicare space – investing in technology and partnering closely with physicians to help them make critical decisions for their patients at the point of care – with an overarching commitment to creating value for all stakeholders.

40. The statements referenced in ¶¶ 29-39 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) SCH had performed inadequate due diligence into Legacy Clover prior to the Business Combination, or else ignored and/or failed to disclose multiple red flags concerning Legacy Clover's business and operations; (ii) since before the Business Combination, Legacy Clover and/or Clover have been under active investigation by the DOJ for multiple issues ranging from kickbacks to marketing practices to undisclosed third-party deals; (iii) Legacy Clover's and/or Clover's sales were, and/or are, driven in large part by an undisclosed related party deal, misleading marketing targeting the elderly, and other illicit practices; (iv) Defendants overstated the capabilities of the Company's technology, which Legacy Clover and/or Clover paid doctors

to use; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

41.     On February 4, 2021, Hindenburg issued a report on Clover entitled "Clover Health: How the 'King of SPACs' Lured Retail Investors Into a Broken Business Facing an Active, Undisclosed DOJ Investigation." Citing "more than a dozen interviews with former employees, competitors, and industry experts, dozens of calls to doctor's offices, and a review of thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials," Hindenburg claimed that "Clover Health and its Wall Street celebrity promoter, Chamath Palihapitiya, misled investors about critical aspects of Clover's business in the run-up to the company's SPAC go-public transaction last month."

42.     Hindenburg continued: "[c]ritically, Clover has not disclosed that its business model and its software offering, called the Clover Assistant, are under active investigation by the [DOJ], which is investigating at least 12 issues ranging from kickbacks to marketing practices to undisclosed third-party deals, according to a Civil Investigative Demand . . . we obtained." Hindenburg wrote that the DOJ's "Civil Investigative Demand and the corresponding investigation present a potential existential risk for a company that derives almost all of its revenue from Medicare, a government payor. Our research indicates that the investigation has merit."

43.     In its report, Hindenburg provided a link to a partially-redacted version of the Civil Investigative Demand that Hindenburg had obtained. The Civil Investigative Demand provided that the DOJ was engaged in "a False Claims Act investigation" that "generally concerns whether Clover Health Investment Corporation and/or related entities improperly

13

induced patient referrals for services paid for by Federal agencies." Among the twelve specific topics that the DOJ sought information from Clover on were: (i) Clover's payments to healthcare providers to induce those providers to recruit patients to Clover's Medicare Advantage plans; (ii) Clover's activities intended to encourage providers to refuse to accept patients with non-Clover coverage; (iii) Clover's payments to providers' staff and employees for conveying any information relating to Clover plans to patients in providers' offices; (iv) payments related to Clover Assistant; (v) Clover's patient recruitment efforts; (vi) Clover's activities relating to matching patients with Medicare Advantage plans; and (vii) the "Seek Medicare" online platform.

44.     The Hindenburg report continued, in relevant part:

> Clover claims that its best-in-class technology fuels its sales growth. We found that much of Clover's sales are driven by a major undisclosed related party deal and misleading marketing targeting the elderly. These practices should not come as a surprise, given that in 2016, [Legacy] Clover was fined for misleading marketing practices by the Centers for Medicare & Medicaid Services (CMS). The fine was issued after [Legacy] Clover's repeated failure to amend misleading statements about its plan offerings. A former employee told us the fine was so small it just emboldened [Legacy] Clover to push the envelope further.

45.     In its report, Hindenburg further flagged Clover's "thinly-disclosed subsidiary called 'Seek Insurance.'" Hindenburg noted that "Seek makes no mention of its relationship with Clover on its website yet misleading advertises to seniors that it offers 'independent' and 'unbiased' advice on selecting Medicare plans" and that Seek "claims, 'We don't work for insurance companies. We work for you', despite literally being owned by Clover, an insurance company. [Seek's] activities are also under investigation by the DOJ."

46.     The Hindenburg report further noted that "[m]ultiple former employees explained that much of Clover's sales are fueled by a major undisclosed relationship between Clover and an outside brokerage firm controlled by Clover's Head of Sales, Hiram Bermudez"; that "[o]ne

14

former employee estimated Bermudez drove ~68% of Clover's total sales, though was unclear on the amount coming from the undisclosed relationship"; that "[o]ne of the former employees [interviewed by Hindenburg] explained that Clover's Head of Sales took efforts to conceal the relationship by putting it in his wife's name 'for compliance purposes'"; that "[i]nsurance filings confirm this"; and that "[t]he Clover contract was quietly put into his wife's name in the weeks after Clover's go-public announcement."

47.     According to the Hindenburg report, "[i]n a CNBC interview announcing the Clover transaction, Chamath proclaimed, unprompted, 'they create transparency . . . they don't motivate doctors to upcode or do all kinds of things to get paid'" and that "[a] former employee explained to [Hindenburg] that the DOJ is specifically asking about upcoding, or the practice of overbilling Medicare." Indeed, "[m]uliple former employees explained" to Hindenburg "that Clover's software is primarily a tool to help the company increase coding reimbursement."

48.     Furthermore, Hindenburg wrote that "according to doctors and former employees we interviewed," physicians use Clover's software "because Clover pays them extra to use it. Physicians are paid $200 per visit to use the software, twice the normal reimbursement rate for a Medicare visit." Rather than being "delight[ed]" by Clover's technology, "[d]octors at key Clover providers described the software as 'embarrassingly rudimentary', 'a waste of my time' and as just another administrative hassle to deal with."

49.     Hindenburg also noted that Defendant Palihapitiya's firm, SCH, invested just $25,000 and agreed that Palihapitiya would promote the Clover SPAC in exchange for an eventual 20.5 million in "founders shares" (worth approximately $290 million today).

50.     On this news, Clover's stock price fell $1.72 per share, or 12.33%, to close at $12.23 per share on February 4, 2021, representing a loss of approximately $700 million in

market capitalization.  Moreover, shares traded as low as $11.86 per share intraday on February 4, 2021.  Additionally, Clover warrants fell $0.18 per warrant, or 5.04%, to close at $3.39 per warrant on February 4, 2021.

51.     Then, on February 5, 2021, before the market opened, Clover filed a Form 8-K disclosing that the SEC was conducting an "investigation and requesting document and data preservation for the period from January 1, 2020, to the present, relating to certain matters that are referenced in the [Hindenburg report]."

52.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Clover securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

54.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Clover securities were actively traded on the NASDAQ and NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of

the Class may be identified from records maintained by Clover or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Clover;

- whether the Individual Defendants caused Clover to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Clover securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

17

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

59.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Clover securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Clover securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

60.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

61.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

18

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

62.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

64.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Clover securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Clover securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

65.     Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were

19

designed to influence the market for Clover securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Clover' finances and business prospects.

66. By virtue of their positions at Clover, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

67. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Clover, the Individual Defendants had knowledge of the details of Clover' internal affairs.

68. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Clover. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Clover' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price

20

of Clover securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Clover' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Clover securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

69. During the Class Period, Clover securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Clover securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Clover securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Clover securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

70. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

72.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73.     During the Class Period, the Individual Defendants participated in the operation and management of Clover, and conducted and participated, directly and indirectly, in the conduct of Clover' business affairs.  Because of their senior positions, they knew the adverse non-public information about Clover' misstatement of income and expenses and false financial statements.

74.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Clover' financial condition and results of operations, and to correct promptly any public statements issued by Clover which had become materially false or misleading.

75.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Clover disseminated in the marketplace during the Class Period concerning Clover' results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Clover to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Clover within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Clover securities.

76.     Each of the Individual Defendants, therefore, acted as a controlling person of Clover.  By reason of their senior management positions and/or being directors of Clover, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Clover to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Clover and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

77.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Clover.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  February 22, 2021

Respectfully submitted,

**s/*Paul Kent Bramlett***
Paul Kent Bramlett
TN #7387/MS #4291
Robert Preston Bramlett
TN #25895
**BRAMLETT LAW OFFICES**
P. O. Box 150734
Nashville, TN 37215-0734
Telephone:    615.248.2828
Facsimile:    866.816.4116
Emails:       PKNASHLAW@aol.com
              Robert@BramlettLawOffices.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
James M. LoPiano
(*pro hac vice* application forthcoming)
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

**HOLZER & HOLZER, LLC**
Corey D. Holzer
(*pro hac vice* application forthcoming)
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346

24

Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com

***Attorneys for Plaintiff***